No. 24,673.

James Sullivan, *Appellant,* v. Edney Smith et al., *Appellees.*

SYLLABUS BY THE COURT.

Ranch Contract—*Negotiations for a Three-year Ranch Contract—Attempted Corrections of Contract—Defendants Took Possession of Ranch—Operated It for Several Months—Defendants Estopped to Deny Validity of Contract.* Sullivan negotiated a three-year ranch contract with the Smiths, copies of which the Smiths signed. Sullivan declined to sign until a sum of money was paid by the Smiths. Afterwards the Smiths sent their copy to Sullivan, requesting that a certain change be made in one particular. Sullivan changed the paragraph, but not in accordance with the request, signed the contract, and returned it to the Smiths. One of them, acting for both, read a part of the paragraph, saw that it was satisfactory in certain particulars, kept the instrument, and by virtue of it the Smiths took possession of Sullivan's ranch, and operated it for the major portion of a year. *Held,* the Smiths are estopped to deny that they are bound by the contract.

Appeal from Logan district court; Isaac T. Purcell, judge. Opinion filed February 9, 1924. Reversed.

*A. E. Crane, B. F. Messick,* both of Topeka, and *Matt Guilfoyle,* of Abilene, for the appellant.

*Ira E. Lloyd, N. F. Nourse,* both of Ellsworth, *E. A. Rea,* and *E. C. Flood,* both of Hays, for the appellees.

The opinion of the court was delivered by

Burch, J.: The action was one to recover possession of a ranch, for an accounting, and for other relief. Plaintiff was defeated, and appeals.

Sullivan resides in Wamego, and owns a large ranch in Logan county. In February, 1920, he negotiated with the Smiths a ranch contract, to become effective on May 1. The Smiths leased the ranch for the years 1921, 1922, and 1923, for which they agreed to pay $500 per year, payable annually. The lease contained a partnership contract providing that each party was to furnish money, property, material, and labor, and share in the profits and interests accruing from the ranch. The Smiths were to furnish and perform the necessary labor, care for the ranch, live stock, and property, and farm the cultivated land. Sullivan was to furnish one-half the cane seed to be planted. All feed and grain produced were to be used in feeding the partnership stock. Sullivan was to leave his tools

and machinery on the ranch for use of the Smiths, was to furnish fencing material, and the Smiths were to care for and keep up the fences. If necessary to purchase feed, Sullivan was to furnish the money, charging one-half to the Smiths. On May 1, the day the contract was to take effect, a division of cattle and horses on the ranch was to take place between Sullivan and the Glenns, who were occupants of the ranch. The cattle and horses to become Sullivan's were to be left on the ranch, and were to be delivered to the Smiths, at stated prices per head. Paragraphs 6 and 7 of the lease read as follows:

"6. It is further agreed that, under ordinary conditions, no cattle shall be sold, divided or moved from the ranch except by agreement of both parties hereto. Provided, however, that in case of drought and shortage of feed to winter all of said cattle, or in case of an emergency, and both parties cannot agree in regard to the care, keep and expense of the surplus cattle, either party hereto shall have the right to call for a division of such surplus cattle, and each remove his share thereof from the premises. In case of the necessity of purchasing extra feed for the said cattle, each party shall stand one-half of the cost of such food, and in case of damage of cattle to others each party shall pay one-half of the same.

"7. It is further agreed that, at the termination of this contract, the said parties hereto shall divide or sell all of the property aforesaid, according to their respective shares and interests therein, and make full settlement of their partnership property."

The contract was prepared in the office of an attorney at law of Ellsworth. Sullivan, the two Smiths, and the stenographer who took the dictation and did the typewriting, were present. Three copies of the instrument were made, which were signed by the Smiths, but not by Sullivan. Sullivan possessed large, while the Smiths possessed limited, financial resources, and Sullivan assured them of his willingness to carry them. Sullivan would not sign the contract, however, until the Smiths paid him $1,500. Sullivan returned to Wamego, taking two copies of the contract with him. The Smiths kept the other copy. Later the Smiths sent Sullivan $1,500, for which he gave them a receipt, dated February 17, 1920. Edney Smith, who acted for himself and his brother, Glenn Smith, wrote Sullivan a letter, requesting that a change be made in paragraph 5 of the contract, which read as follows:

"The said party of the first part shall leave upon the said premises one-half of all cattle and horses owned jointly by James Sullivan and Charles Glenn and Joseph Glenn, that are now on the Winona and Sharon Springs ranches, to be delivered May 1, 1920, at the following prices:

"All cows that will have calves by their sides August 1, 1920, at $75 (calf to go with cow); all yearling steers and heifers to be delivered at above date at $40; all heifers coming two years old, at $55; all steers coming two years old, at $50; three bulls, one at $100 per head, and two $80 per head; two stallions, to be divided; mares from three to seven years, at $80 per head; horses from three to six years old, at $70; colts from one to two years old, $40; aged mares, that bring colts, $50; registered cows delivered to be $125 per head; any weedy horses at $40 per head."

The prices fixed were full prices, and since purchase by the Smiths of a one-half interest was contemplated, it was considered proper to make it certain their obligation was for half prices only. Sullivan cut paragraph 5 from the instrument, and pasted upon it another paragraph 5, which reads as follows:

"5. The said party shall leave upon the Winona ranch, in Logan county, Kansas, one-half of all cattle and horses hereinafter described and owned jointly by Jas. Sullivan, Chas. Glenn, and Joseph Glenn, and shall sell one-half interest in same to the party of the second part, at the following prices, May 1, 1920: All registered cows per head $125, one-half to the second parties $62.50. All cows that have calves by their sides, Aug. 1, calves included, per head $75. All yearling steers and heifers, per head $40, one-half to the second parties $20. All heifers coming two years old per head $55, one-half to the second parties $27.50. All steers coming two years old per head $50, one-half to the second parties, $25. Three bulls (1 bull $100, 2 bulls $160), one-half to the second parties $130. Stallions to be divided. All mares from five to seven years old, per head $80, one-half to the second parties $40. All horses three to six years old, per head $70, one-half to the second parties $35. Colts from one to two years old per head $40, one-half to the second parties $20. Aged mares that bring colts, per head $50, one-half to the second parties $25.

"Upon payment of the above amount set forth with interest at seven per cent per annum from May 1, 1920, the same being the amount due him from the said parties of the second part, the said parties of the second part shall become and be the joint owners of the one-half interest in and to such cattle and horses and the increase thereof. And provided further that if the said parties hereto decided to purchase, as has been agreed upon, and place upon said premises any cattle and horses, each is to furnish one-half of the purchase price thereof and each is to be equal owners and share equally in the profits of such cattle and horses."

In this form the instrument, with Sullivan's signature upon it, was sent to the Smiths. Sullivan testified that in making up the paragraph he followed Smith's letter, except that the provision for interest and the provision relating to additional stock were not in the letter, but had been agreed on.

On March 10, the Smiths went on to the ranch to get ready for

spring work. When the time came to make division of stock be-
tween Sullivan and the Glenns, the Smiths participated in the di-
vision, and took charge of the stock and the ranch. The ranch op-
erations were not successful. In January, 1921, Glenn Smith left
the ranch. Later, Edney Smith asked Sullivan for wages, and in
February he told Sullivan he had quit. In March Sullivan brought
this suit.

The petition pleaded the contract in the form it presented after
it was changed. The petition did not state in express words that
the Smiths took possession of the ranch under the contract, but the
plain theory was they did so. Their duties, under the contract, were
specified, breaches of those duties were charged, and the action was
predicated on the contract as the basis of the conduct of the parties.

The answer undertook to avoid the contract in this way. It was
alleged that, after the first draft was signed by Sullivan and the
Smiths, it was discovered paragraph 5 did not express the true
agreement of the parties. A verbal agreement was then made that
there should be added to the paragraph words in substance and in
effect as follows:

"Second parties shall have the right to purchase the undivided one-half of
all of said stock at one-half of the aforesaid prices."

Continuing, the answer alleged that, in order that the change
might be made in typewriting, the signed contract was returned to
Sullivan. Sullivan altered the contract by substituting the new
paragraph 5. The alteration was unauthorized, wrongful, and
fraudulent, was made without knowledge or consent of the Smiths,
and the Smiths did not discover the depredation on their rights
until shortly before suit was commenced. The prayer was for a
money judgment against Sullivan for $7,166.50.

The testimony of the Smiths did not support their answer very
well. Glenn Smith was not used very much as a witness for the
defense. He testified he was his brother's partner, he let his
brother attend to the details of the business with Sullivan, and he
knew whatever his brother did would be satisfactory. Then he said
what his brother did was satisfactory "if he showed me." Having
left conduct of the business to his brother, his satisfaction or dis-
satisfaction with what his brother did is not material. Because
Edney Smith was actor in the business with Sullivan, the burden
of sustaining the answer fell upon him.

The substance of no conversation at any time or at any place was given in which the subject of an option to purchase the cattle and horses described in original paragraph 5, was talked over. The record is barren of any suggestion of a date when the option was to be exercised or relinquished, whether on May 1, 1920, or when the cattle business looked promising, or at the end of one, two, or three years. When the division of cattle between Sullivan and the Glenns occurred, and the Smiths took charge of those left on the ranch, it did not occur to anybody that there existed an indefinite relation, to be made definite by exercise or relinquishment by the Smiths of an option to buy. There was no testimony whatever of any verbal agreement with Sullivan to correct the first writing by putting into it the option paragraph. The need for supposed correction of the contract was not discovered after Sullivan signed, but after he returned to Wamego from Ellsworth with two copies of the contract which he declined to sign until he received $1,500.

The answer did not explain the $1,500 payment, and Edney Smith had some difficulty in reconciling that payment with the option theory. He testified he learned from a friend that Sullivan had a ranch, that the Glenn boys had a half interest in the stock on the ranch, and that they were to leave in the spring; he went to Wamego to talk with Sullivan about going on the ranch; he went to the ranch and saw part of the cattle before the meeting at Ellsworth to prepare a contract; Sullivan did not sign at Ellsworth; Sullivan was to receive $1,500 first. He then gave the following peculiar explanation of the $1,500 payment:

"Q. What were you to pay the $1,500 for? A. for rent.

"Q. For rent? A. Yes.

"Q. What did you give that money for? A. He demanded that much money before he would make a contract.

"Q. He demanded that much money paid on the contract for these cattle, did he? A. No, he did not.

"Q. What was the money paid for? A. It was paid for an interest in the profits and for rent. We might take it for another year or several, perhaps. He thought we might be more interested if we paid something in advance."

Afterwards Smith testified "The lease was our contract;" "I understood that under the lease I was manager of the place;" I thought the lease was binding on me." The contract contained this provision in the lease portion, and before the provisions relating to partnership operation of the ranch:

Sullivan v. Smith.

"To have and to hold the same, unto the said parties of the scond part, for the term of three years, commencing on the 1st day of May, 1920, and ending on the 1st day of May, 1923, upon the terms and conditions hereinafter stated.

"And the said parties of the second part, in consideration of the leasing and occupancy of the said premises as above set forth, covenant and agree to pay to the said party of the first part, his heirs and assigns, as rent for the same, the sum of $500 annually, said annual sum to be due on the 1st day of May of 1921, 1922, and 1923, respectively, provided, however, that if said annual rent is not paid when due that the same shall bear interest at the rate of seven per cent per annum from maturity until paid."

No correction of this rent covenant was asked when the lease was sent back to Sullivan to be reformed.

Edney Smith also had difficulty in telling how he was to get a profit if he had no cattle. Paragraphs 6 and 7 of the contract have never been challenged by the Smiths. To find a basis for profit without interest in cattle, the witness undertook, and his counsel in their brief undertake, to convert "surplus" cattle, mentioned in paragraph 6, into "increase." This court is able to interpret the paragraph, and it is not susceptible of such distortion. Under ordinary conditions, no cattle were to be sold, divided, or moved from the ranch, except by agreement; but in case of drouth, or shortage of feed, or emergency, making it impossible to care for all the cattle on the ranch, the surplus over what could be cared for were, in default of agreement, etc., to be divided, and each party was to remove his share. At the termination of the contract the parties were to sell or were to divide all the property, according to their shares and interests, and make full settlement of their partnership property—partnership property evidently meaning partnership affairs.

In his testimony Smith would forget the theory of the answer, that all he contracted for was an option to buy, which he never exercised. He testified as follows:

"We drew up a contract that gave both of us a half interest in the stock. I saw part of the cattle and put a price on them. There was a price put in the contract. It was the price that we made when we joined in the contract."

The price of a half interest in the cattle amounted to $10,135. He testified as follows:

"Q. Did you in that letter at any time or in any manner ever promise to pay Mr. Sullivan $10,138, or any sum, for a half interest in these cattle? A. Yes."

The letter referred to was the letter in which he requested that

Sullivan v. Smith.

the price per head to him be made clear in the contract. After-
wards he testified as follows:

"Q. Now, the contract says in paragraph 1: . . . 'And provided fur-
ther, that all feed and grain produced on said premises is to be used in feed-
ing the partnership stock, kept and maintained thereon.' A. That was the
partnership stock as that provided."

"Q. Listen: 'It is further agreed by the parties hereto that party of the
first part shall furnish all money for necessary feed that is bought, charging
the parties of the second part for one-half of the same.' A. Well, we bought
a half interest in the stock."

Having thus let the cat out of the bag, he floundered as follows:

"Q. When and in what way did you buy a half interest in the stock? A.
It was my understanding that I did.

"Q. How were you to handle these cattle? A. I expected to handle them
to make them make money.

"Q. You were a half owner? A. We probably were.

"Q. You thought you were; it was your understanding that you had a half
interest? A. He did not need the money. He kept telling me that we had
a half interest in the cattle. I could have a half interest in the cattle; that
he could raise the money; that we could have a half interest in the cattle at
the prices stated. He claimed he did not need the money."

The question whether the contract had been altered, and so be-
came nugatory, was tried first. The court found alteration, and
then heard evidence from which it was concluded Sullivan owed the
Smiths $4,016.80. The findings bearing upon the subject of altera-
tion are all that need be considered.

The court found that, after negotiation, the contract with original
paragraph 5 in it was prepared, and duplicates were signed by the
Smiths, but were never signed by Sullivan because he demanded
payment of $1,500 before he would sign. The Smiths, not being
satisfied with clause 5, requested Sullivan to change it so it would
read in effect "that the defendants could have the option to pur-
chase the stock mentioned in said clause 5 at one-half of the price
named in said clause 5."

For the purpose of making the change, both copies signed by the
Smiths came into the hands of Sullivan. After Sullivan made the
change in each of the two copies theretofore signed by the Smiths,
Sullivan signed them and returned one copy to Edney Smith.

The court found that Edney Smith did not discover the alteration
until about February 10, 1921, Glenn Smith did not discover the
alteration until July, 1921, and neither of the Smiths knew of or
consented to the change. Edney Smith testified he received the

changed contract by mail from Sullivan, saw the instrument had
been cut in two parts, saw, paragraph 5 had been pasted on, saw·
the prices of the cattle had been changed and were all right, saw
his signature was affixed, and kept the instrument.  He testified
nothing 'prevented him from reading it, but he did not do so.
Sullivan requested the court to make a finding embodying sub-
stantially the foregoing facts, but the request was denied, and no
finding was returned covering the subject.  The court erred in
refusing the finding and, as will appear later, the finding which
was made is contrary to law.

Finding No. 2 reads as follows:

"The court finds that the plaintiff made such alterations with the intent
and for the purpose of charging the defendants with the one-half value of
all the live stock mentioned in said clause 5, the total value fixed for all
of the stock in said paragraph amounted to $20,270, and that the intent of
making the change was to charge the defendants with one-half, or $10,135, as a
fixed definite debt, and to obligate the defendants to pay interest on said sum
at 7 per cent per annum from May 1, 1920; that it was the further intent of the
plaintiff that in the event of the death or decrease in price of any of the said
stock, that the said defendants should still be held for the said one-half value,
or $10,135, with interest at 7 per cent from May 1, 1920."

There is no evidence Sullivan ever had specifically in mind mak-
ing Smiths pay half the value of dead cattle, or making them stand
part of a decline in price.  The original contract contemplated sale
of a half interest in stock to the Smiths, and operation of the ranch
on a partnership basis.  The changed contract did the same thing,
and the whole finding is nothing but a gratuitous statement of the
legal effect of a written instrument.

The fourth finding reads as follows:

"The court further finds that at the time the defendants signed the instru-
ments hereinbefore mentioned, they were farmers, and were considerably in
debt, and would have but little left after all their debts were paid, and that
the plaintiff knew that they were not in good financial circumstances nor in
any manner able to purchase and pay $10,135 for cattle."

The Smiths were not merely farmers.  They were cattlemen, with
a herd of ninety head of cattle of their own.  Edney Smith said
he was looking for a ranch, and went to Sullivan to see about
leasing his ranch.  Immediate payment for a half interest in the
cattle was not contemplated.  Sullivan told them he would carry
them.  The contract ran for three years.  Edney Smith said he
expected to make the cattle make money, and there is no basis in

the evidence for a positive inference of fact that the contract with
Sullivan was improvident at the time it was made.    Much less
is there any-basis in the evidence for an inference that Sullivan
wickedly contrived to protect himself against loss by fabricating an
obligation on the part of -men whom he knew to be financially
irresponsible.   Had he foreseen the disastrous course the cattle busi-
ness was to take, his canniness would have led him to seek better
security.

The fifth finding reads as follows:

"The court further finds that the plaintiff informed the defendants that it
was not necessary for them to put in any money, that he had plenty of
money, and that they would make money from the profits of the ranch."

There is no evidence Sullivan ever represented to the Smiths that
they would make money from the profits of the ranch, and Edney
Smith did not concede that he believed he could make the cattle
make money because Sullivan pictured profits to him.

The remainder of the fifth finding does not present the true facts
or embody a justifiable inference from the facts.   Except when
Edney Smith was admitting he purchased a half interest in the
cattle, he was taking the position he did not accept Sullivan's offer
to carry them for the price, and merely reserved an option to pur-
chase.   While Sullivan agreed to advance money to buy feed, and
was willing to advance money to the Smiths for ranch operations,
an undisputed portion of the lease provided the Smiths should pay 7
per cent interest on advancements, and Edney Smith testified as
follows:

"We were to pay 7 per cent interest on money advanced by Mr. Sullivan
. . . If we had to buy feed we were to pay for half of it.   Mr. Sullivan
furnished the money.   .   .   .   I expected to be able to pay him back at 7 per
cent interest.

"Q.   What were you to do if there was a loss under your idea of the con-
tract; if they did not make money, what were you going to do?   A.   I figured
we would make some money."

The sixth finding reads as follows:

"The court further finds that the defendants, owing to the said statements
and inducements of the plaintiff, had confidence in him and did not question
anything that he said or did, and that they went upon the ranch March 10,
1920, for the purpose as they understood of putting in their labor and im-
plements and the horses they had, against the land and property furnished by
the plaintiff, and were to share in one-half of the profits after the payment of
all necessary expenses, and did not believe or know that it was claimed or

would be claimed that the contract had been changed to show they had purchased a $10,135 interest in the stock mentioned in paragraph 5, or had agreed to pay interest thereon at 7 per cent from May 1, 1920; and that they were deceived by reason of the said contract being so changed, and never agreed to purchase other stock as shown by said such alteration."

All of the inducements which Sullivan held out to the Smiths have been stated. If they caused the Smiths to throw prudence to the winds, and led them not to question anything Sullivan said or did, the Smiths ought to have known about it, and there is no testimony from their lips that such was the case.

The answer was verified, and charged Sullivan with preparing the contract contrary to agreement, so that it had to be corrected. Therefore, the Smiths were sharply questioning what Sullivan did before they went on the ranch. Edney Smith made no claim that he omitted to read the supposedly corrected contract when it came back to him, because of any supreme confidence in Sullivan, and there is no reasonable basis in the evidence for the extravagent first part of the sixth finding of fact.

There were 7,000 acres in the ranch. The Sullivan stock was valued at more than $20,000. Sullivan received 60 head of horses in the division with the Glenns. When the Smiths went on the ranch, they took five horses, two sets of double harness, two riding cultivators, a lister, and a disk plow. Overlooking the $1,500, the court finds the Smiths believed they were putting the labor of two men and this meager outfit against Sullivan's ranch and stock, for half the profits. What was the foundation for this understanding? The answer necessarily is, the written instrument which Edney Smith said was his contract. That instrument spoke for itself. Its interpretation was a matter for the court, and the Smiths were bound by it, no matter how they said they understood it. It will be observed the finding does not purport to be a statement of the meaning of the contract. It is a finding of what Edney Smith testified he thought it meant, which is not material to determination of the rights of the parties.

The concluding portion of the sixth finding is contrary to law. The finding related to discovery of the alteration, and the requested finding relating to the same subject, have been referred to. Because the request was based entirely upon the testimony of Edney Smith, his admissions may be considered the same as if they were embodied in a finding. Smith returned the contract to Sullivan for the express

purpose of having it changed. The modification he says he suggested did not consist in a revision of the prices in old paragraph 5, but in the addition of one sentence to the paragraph. When the contract came back to him from Sullivan, his attention was challenged by the radical change made in its appearance by cutting and pasting. He admitted that, with the contract in his hands, he had his eyes on paragraph 5, saw the prices had been changed, and saw they were all right, although the change was not made in accordance with his direction. Having satisfied himself with the middle portion of the paragraph where the changes occurred, the law does not permit him to trifle by denying knowledge of what came immediately before and what came immediately after. It is not necessary to consume space by printing a list of authorities.

Having knowledge of what the contract was, the Smiths made no objection to it, went upon the ranch and stayed there by virtue of it, and the findings of the court relating to option and alteration are of no consequence whatever.

It is said the contract was changed with fraudulent intent, and that being fraudulent, the Smiths could not accept it, ratify it, and act upon it in a manner to bind them. Such is not the law. It is a common thing for a party to a business transaction to waive fraud and affirm a contract which might be avoided on the ground of fraud, and the law imposes no barrier to doing so, except the fraudulent act be criminal. According to the express findings of fact relating to the circumstances of the change, no contract had yet come into existence when paragraph 5 was changed. Besides that, the court did not find that Sullivan changed paragraph 5 with fraudulent intent. So much else appears in the findings, relevant and irrelevant, sustained by evidence and not sustained by evidence, and it would have been so easy to make such a finding, that this court is satisfied fraudulent intent was not overlooked, but was studiously excluded. The result is, the defendants are estopped to deny that the contract pleaded in the petition is the contract which measures the rights of the parties.

The judgment of the district court is reversed, and the cause is remanded with direction to give effect to the estoppel just referred to, and determine the rights of the parties accordingly.